UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOHNNIE FUNDERBURKE,

Plaintiff,

v.

Case # 13-CV-6128-FPG

DECISION & ORDER

WESLEY CANFIELD, THOMAS GRIFFIN,
BENJAMIN OAKES, and JEREMY CLEMENT,

Defendants.

## INTRODUCTION

*Pro se* plaintiff Johnnie Funderburke ("Plaintiff") brings this civil rights action against Defendants Wesley Canfield, Thomas Griffin, Benjamin Oakes, and Jeremy Clement based on alleged violations of his constitutional rights while he was housed at Southport Correctional Facility ("Southport"), a prison administered by the New York State Department of Corrections and Community Supervision ("DOCCS"). Specifically, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs and seeks relief under 42 U.S.C. § 1983.

Currently pending before the Court is Defendants' Motion for Summary Judgment (ECF No. 39). For the reasons stated below, Defendants' Motion is granted in part and denied in part.

## BACKGROUND[1]

### I.   Neurontin

In 2003, Plaintiff was shot twice – once in the collar bone and once in the hip – and crashed his car into a tree while traveling at 80 miles per hour. As a result of the injuries suffered in this incident, Plaintiff underwent three surgeries including a hip replacement.

---

[1]      Except as otherwise stated, the following undisputed facts are taken from the parties' respective Local Rule 56 Statements (ECF Nos. 39-10, 49-1).

After the surgeries, Plaintiff was prescribed Neurontin to alleviate persisting nerve pain in his leg and foot. Plaintiff continued to receive Neurontin while incarcerated at Riverhead Suffolk County Jail, Riker's Island, Cape Vincent Correctional Facility, and Watertown Correctional Facility.

In June 2012, Plaintiff was sent to Southport from Groveland Correctional Facility. At Southport, Plaintiff was seen by Dr. Wesley Canfield ("Dr. Canfield"). Dr. Canfield changed Plaintiff's dosage of Neurontin from 900 milligrams three times per day to 600 milligrams three times per day. At Southport, drugs such as Neurontin are administered in crushed form. Inmates must ingest the medication in front of the administering nurse, open their mouth and lick their hand to show that all of the medicine has been consumed.

On July 16, 2012, Plaintiff was placed on Voltaren. ECF No. 39-5, Ex. C; ECF No. 39-1, at 11. Voltaren is an anti-inflammatory, and was prescribed for an injury to Plaintiff's rotary cuff. ECF No. 39-3, Ex. A, at 53:14-22. Dr. Canfield eventually switched Plaintiff from Voltaren to Indocin on February 14, 2014. ECF No. 39-9, Ex. G, ¶ 17; ECF No. 39-1, at 11.

On August 21, 2012, Nurse Jeremy Clement ("Clement") came to see Plaintiff at his cell. Clement gave Plaintiff his dose of crushed Neurontin, but then dropped down to examine Plaintiff's foot instead of watching Plaintiff take the medication. Plaintiff claims he took the medication like he was supposed to; Clement claims that Plaintiff did not take the medication. Clement wrote in Plaintiff's medical record that Plaintiff did not take his medication, but Plaintiff was not given a Misbehavior Report.[2]

Clement brought his notes regarding the August 21, 2012 incident to the attention of Physician's Assistant Benjamin Oakes ("Oakes"). After conferring with Dr. Canfield, Oakes discontinued Plaintiff's Neurontin medication. Without Neurontin, Plaintiff experienced

---

[2] According to Plaintiff, inmates at Southport are supposed to automatically receive a Misbehavior Report when they are accused of holding or abusing medication. ECF No. 39-3, Ex. A, at 25:12-17. Defendants do not contest this fact.

intensive pain and suffering.  At his deposition, Plaintiff testified that "when on the Neurontin it's a steady comfortable, like you're comfortable with the pain because you are taking medication.  When you don't have it, without it you're in severe pain.  There is nothing else you can do."  ECF No. 39-3, Ex. A, at 103:19-22.  Plaintiff also testified that Neurontin "doesn't knock the pain off completely, but it reduces it and mellows it out."  *Id.* at 103:11-12.  Without Neurontin, Plaintiff testified that "every step I take is pain."  *Id.* at 103:7.

During the time he was not receiving Neurontin, Plaintiff wrote to Superintendent Thomas Griffin ("Griffin") "a number of times[,] making him aware that defendant Clement falsely accused him of not taking his medication, and ultimately caused defendants Oakes and Canfield to deny plaintiff his medication."  ECF No. 49, at 21.  In addition, Plaintiff once stopped Griffin as he was making rounds and told him, "Excuse me, superintendent.  They not giving me my medication.  They saying they discontinued my medication because they saying I cuffed it, I hold it.  Where is the misbehavior report?  You can't just take me off of your medication like that."  ECF No. 39-3, Ex. A, at 25:9-13.

Plaintiff did not receive Neurontin or any other nerve pain medication until March 19, 2014, when Dr. Canfield agreed to reinstate Plaintiff's Neurontin prescription at a substantially lower dose of 100 milligrams three times per day.  ECF No. ECF No. 51.

## II.  Leg Brace

In addition to nerve pain, Plaintiff suffers from a gait abnormality called "foot drop" that prevents him from walking normally.  ECF No. 39-3, Ex. A, at 13:19-22.  Dr. Canfield met with Plaintiff on July 10, 2012 to address this issue.  ECF No. 39-9, Ex. G.  Dr. Canfield measured Plaintiff's leg and sent a request for an orthotic leg brace to be fashioned, which would allow Plaintiff to ambulate with decreased pain and increased stability.  *Id.*  However, the request was ultimately denied by security personnel.  *Id.*  Specifically, security was concerned that the metal

components of the leg brace posed a security risk because they could be used to make a weapon or block a door. ECF No. 39-1, at 13.

Plaintiff alleges Dr. Canfield has ordered many leg braces for inmates in the past, and therefore was "in full knowledge that the facility security provisions will not allow the inmate to have the leg brace." ECF No. 49, at 19. In light of this security policy, Plaintiff alleges that simply ordering a leg brace "effectively denies the inmate medical attention." *Id.*

## III.   Exhaustion of Administrative Remedies

The grievance system in prisons administered by DOCCS is a three-tiered process. First, the inmate must file a grievance with the Inmate Grievance Review Committee ("IRGC"). 7 N.Y.C.R.R. § 701.5(b). A decision by the IRGC may be appealed to the Superintendent of the relevant facility. 7 N.Y.C.R.R. § 701.5(c). The Superintendent's decision may be appealed to the Central Office Review Committee ("CORC"). 7 N.Y.C.R.R. § 701.5(d). The CORC is required to complete its review of the grievance within 30 days of receipt. 7 N.Y.C.R.R. § 701.5(d)(3)(ii).

From August 21, 2012 through August 30, 2012, Plaintiff filed seven grievances regarding the discontinuance of his Neurontin medication. ECF No. 39-8, Ex. F. Plaintiff appealed the decision of the IRGC to the Superintendent, but did not appeal the decision of the Superintendent to the CORC. *Id.*

On February 12, 2013, Plaintiff filed a grievance regarding Neurontin and the leg brace. ECF No. 39-7, Ex. E. That grievance was denied, and Plaintiff appealed to the Superintendent. *Id.* On March 1, 2013, after the appeal was denied by the Superintendent, Plaintiff appealed to the CORC. *Id.* On March 8, 2013, before the CORC determined the appeal, Plaintiff filed the instant federal complaint. ECF No. 1. On July 3, 2013, Plaintiff's appeal was denied by the CORC. ECF No. 39-7, Ex. E. Plaintiff contends that he filed his federal complaint before

receiving a response from the CORC because he was seeking immediate injunctive relief in order to receive the medication that he was in "dire need of."

## LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  On the other hand, the non-moving party may defeat a summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When reviewing a motion for summary judgment, the court must resolve genuinely disputed facts in favor of the non-moving party and must view inferences to be drawn from the facts in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).  However, a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

## DISCUSSION

In Defendants' Motion for Summary Judgment, Defendants raise the following arguments: (1) Plaintiff's official capacity claims are barred; (2) Plaintiff failed to exhaust his administrative remedies; (3) Defendants were not deliberately indifferent in failing to provide Plaintiff with Neurontin; (4) Dr. Canfield was not deliberately indifferent in failing to obtain a leg brace for Plaintiff; (5) Defendants Griffin and Clement were not personally involved in any constitutional violation; and (6) Defendants are entitled to qualified immunity.  ECF No. 39-1. These arguments are addressed in turn.

I.   **Official Capacity Claims**

Under well-established Supreme Court precedent, States are not "persons" subject to suits for damages under § 1983.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Because "a suit under § 1983 against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," such a suit is "no different from a suit against the State itself."  *Id.*  Accordingly, officials sued in their official capacities are also not "persons" subject to suits for damages under § 1983.  *Id.*

It is equally well-established, however, that a state official may be sued in his or her official capacity for prospective injunctive relief.  *Id.* at 71 n.10 (citing *Ex Parte Young*, 209 U.S. 123, 159-160 (1908)).  This is because "official-capacity actions for prospective relief are not treated as actions against the State."  *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

Here, Plaintiff indicated in his form complaint under § 1983 that he is suing all Defendants in both their individual and official capacities.   ECF No. 1, at 2.   Plaintiff also indicated that he is seeking relief in the form of "a[n] injunction compelling Defendants to provide Plaintiff proper medication," as well as both compensatory and punitive damages.  ECF No. 1, at 5.  Ordinarily, the fact that Plaintiff is seeking prospective injunctive relief would allow him to sue Defendants in their official capacities.  *Ex Parte Young*, 209 U.S. at 159-160. However, because Dr. Canfield has since reinstated Plaintiff's Neurontin prescription, Plaintiff's claim for injunctive relief is moot.  *See* ECF Nos. 51, 52.   That means the only remaining form of relief sought in this case is damages, and that Plaintiff's official capacity claims must be dismissed.  *Will*, 491 U.S. at 71.

## II.    Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1996 ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In other words, inmates must exhaust the administrative remedies available to them as part of the prison grievance process before seeking relief in federal court for any claims about prison life. *Porter v. Nussle*, 534 U.S. 516 (2002). Exhaustion must also be "proper," meaning that the inmate plaintiff must have complied with the relevant "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). The rules and deadlines that must be followed are defined not by the PLRA, but by the prison grievance process itself. *Jones v. Block*, 549 U.S. 199, 218 (2007). Failure to exhaust is an affirmative defense, *id.* at 216, meaning that defendants bear the burden of proof. *Arnold v. Goetz*, 245 F. Supp. 2d 527, 534 (S.D.N.Y. 2003) (citing *Reyes v. Punzal*, 206 F. Supp. 2d 431, 433 (W.D.N.Y. 2002)).

Although exhaustion is mandatory, dismissal is not automatically warranted every time a prisoner fails to precisely follow the correct procedures. In *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), the Second Circuit explained that an inmate's failure to exhaust administrative remedies may be excused where (1) administrative remedies were not in fact "available" to the inmate; (2) defendants have forfeited the affirmative defense of non-exhaustion by either failing to raise it or by acting to inhibit the inmate's exhaustion; or (3) "special circumstances" justify the inmate's failure to exhaust. *Id.* With respect to the third category, a reasonable misunderstanding of the grievance procedures has been held to be a

"special circumstance" justifying an inmate's failure to exhaust. *Id.* (citing *Giano v. Goord*, 380 F.3d 670, 678 (2d Cir. 2004)).[3]

Here, Plaintiff filed a grievance regarding Neurontin and the leg brace on February 12, 2013. ECF No. 39-7, Ex. E. On March 1, 2013, after his grievance was denied by both the IRGC and the Superintendent, Plaintiff appealed to the CORC. *Id.* On March 8, 2013, Plaintiff filed the instant federal complaint. ECF No. 1. On July 3, 2013, over three months after the 30-day deadline imposed by 7 N.Y.C.R.R. § 701.5(d)(3)(ii), Plaintiff's appeal was denied by the CORC. ECF No. 39-7, Ex. E.

Defendants now raise the affirmative defense of failure to exhaust, arguing that Plaintiff's Complaint should be dismissed because Plaintiff instituted this action before the CORC rendered its decision. ECF No. 39-1, at 6-8. As a general matter, Defendants are correct that exhaustion after-the-fact is insufficient. *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) ("Subsequent exhaustion after suit is filed . . . is insufficient."), *abrogated in part on other grounds by Porter*, 534 U.S. at 519.

Plaintiff concedes that he did not wait for a response from the CORC, but cites *Hemphill* and argues that his premature filing should be excused. ECF No. 49, at 9-12. Specifically, Plaintiff explains that he thought he was justified in filing his federal complaint early because he "needed the court to intervene by way of injunctive relief to help him receive his medication to combat his intensive pain for the serious injuries he sustained." ECF No. 49-1, at 13-14; *see also* ECF No. 49, at 9-10. Defendants reserved the right to file reply papers in their Notice of Motion, *see* ECF No. 39, at 2, but neglected to do so.

---

[3]     Although the Second Circuit has recognized the possibility of tension between the "special circumstances" exception described in *Hemphill* and the Supreme Court's call for "proper" exhaustion in *Woodford*, it has so far declined to rule on the issue. *See Heyliger v. Gebler*, 624 F. App'x 780, 782 n.3 (2d Cir. 2015). Defendants have not presented any argument that the *Hemphill* exceptions do not apply.

In *Rivera v. Pataki*, No. 01 CIV.5179 MBM, 2003 WL 21511939, at *6 (S.D.N.Y. July 1, 2003), the *pro se* plaintiff similarly argued that he should be excused from the exhaustion requirement due to the fact that he was seeking immediate injunctive relief.  *Id.*  The Court in *Rivera* rejected that argument and provided the following reasoning:

> Although *Marvin*[ *v. Goord*, 255 F.3d 40, 43 (2d Cir. 2001)] suggested that there might be an exception to the exhaustion requirement when a plaintiff seeks urgent medical relief and administrative remedies are ineffective, there appear to be no cases relying on *Marvin* to find an "urgent medical relief" exception to the PLRA's exhaustion requirement, and it is difficult to square *Booth v. Churner*, 532 U.S. 731, 739, 121 S. Ct. 1819, 149 L.Ed.2d 958 (2001) and *Porter* with the existence of such an exception.

*Rivera*, 2003 WL 21511939 at *6.  Thus, the fact that Plaintiff sought injunctive relief in his federal complaint does not excuse him from the exhaustion requirement.  The question under *Hemphill*, however, is whether Plaintiff's misunderstanding was *reasonable*.  Given the fact that the Second Circuit in *Marvin* did suggest that such an exception might apply, it would be difficult to conclude that Plaintiff's understanding was unreasonable.  It is also important to note that Defendants, who bear the burden of proving the affirmative defense of non-exhaustion, have not provided any argument to the contrary.  Plaintiff specifically cited *Hemphill* in his brief and argued that failure to exhaust may be excused if the administrative remedy was not available in fact or if special circumstances exist to justify the failure.  ECF No. 49, at 10.  Although Defendants reserved the right to file reply papers, *see* ECF No. 39, at 2, they neglected to do so and therefore have not responded to Plaintiff's legitimate basis for excuse.  Accordingly, the Court finds that Defendants have failed to meet their burden of proving the affirmative defense. *See Borges v. Adm'r For Strong Mem'l Hosp.*, No. 99-CV-6351FE, 2002 WL 31194558, at *3 (W.D.N.Y. Sept. 30, 2002).

III.   **Discontinuation of Neurontin**

Plaintiff brings this case under 42 U.S.C. § 1983, which imposes civil liability on any person who, under color of state law, deprives another person "of any rights, privileges, or immunities" secured by the U.S. Constitution or federal law.   42 U.S.C. § 1983.   More specifically, Plaintiff alleges Defendants violated the Eighth Amendment when they deprived him of his Neurontin medication from August 21, 2012 until March 19, 2014.   ECF No. 1.

In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must establish that Defendants were deliberately indifferent to his serious medical needs. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).   This standard includes both an objective and subjective prong.   "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'" *Chance*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)).   Second, the defendant must have acted "with a sufficiently culpable state of mind." *Id.*   The second prong, which is subjective, is satisfied when the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

Defendants argue that summary judgment should be granted because Plaintiff has failed to meet either prong.   However, summary judgment is inappropriate because genuine issues of material fact exist as to both prongs.

### A. Objectively Serious Medical Need

"Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003). Although "[t]here is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition," *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003), the

Second Circuit has provided a non-exhaustive list of factors in order to guide the analysis.  Those factors include: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance*, 143 F.3d at 702).

In *Hathaway v. Coughlin*, 37 F.3d 63, 67 (2d Cir. 1994), plaintiff William Hathaway had a degenerative hip condition which required corrective surgery.  After the surgery, Hathaway "continued to experience great pain over an extended period of time and had difficulty walking." *Id.*  Given these facts, the Second Circuit held that "[t]he record clearly supports a finding that Hathaway had serious medical needs." *Id.*

The facts of this case are indistinguishable from *Hathaway*.  Plaintiff was shot twice – once in the collar bone and once in the hip – and crashed his car into a tree while traveling at 80 miles per hour.  As a result of the injuries suffered in this incident, Plaintiff underwent three surgeries including a hip replacement.  After the surgeries, Plaintiff was prescribed Neurontin to alleviate persisting nerve pain in his leg and foot.  When Defendants discontinued his Neurontin prescription from August 21, 2012 until March 19, 2014, Plaintiff suffered severe pain.  At his deposition, Plaintiff testified that "when on the Neurontin it's a steady comfortable, like you're comfortable with the pain because you are taking medication.  When you don't have it, without it you're in severe pain.  There is nothing else you can do." ECF No. 39-3, Ex. A, at 103:19-22.  Plaintiff also testified that Neurontin "doesn't knock the pain off completely, but it reduces it and mellows it out." Id. at 103:11-12.  Without Neurontin, Plaintiff testified that "every step I take is pain." *Id.* at 103:7.

Defendants argue that Plaintiff's medical records indicate his pain was not significant or urgent enough to satisfy the first prong of the analysis.  ECF No. 39-1, at 10.  The question at

this stage of the litigation, however, is whether Plaintiff has established that there is a genuine dispute of material fact for trial. *See, e.g., Celotex Corp.*, 477 U.S. at 322.  Given Plaintiff's testimony about the daily pain he suffered when he was deprived of his nerve pain medication from August 21, 2012 until March 19, 2014, a genuine issue of material fact does exist as to whether Plaintiff's pain was sufficiently serious.

### B. Deliberate Indifference

With respect to the subjective prong of the Eighth Amendment analysis, a prison official acts with culpable "deliberate indifference" when that official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.  Mere negligence, without more, is insufficient to engender a constitutional claim. *Chance*, 143 F.3d at 703.  That is true even if the conduct constitutes medical practice. *Id.*

Furthermore, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*  At the same time, however, "a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan." *Id.* (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir.1974)).  "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Id.*

Here, a dispute arose about whether Plaintiff took his Neurontin medication on August 21, 2012.  Plaintiff claims he took his medication; Clement, who had dropped down to examine Plaintiff's foot, claims that Plaintiff did not take the medication.  Because Plaintiff is the non-moving party, the Court must assume for the purposes of this motion that Plaintiff did in fact take his medication. *See, e.g., Adickes,* 398 U.S. at 158-59.  Plaintiff was not issued a

Misbehavior Report for this incident, meaning that there was no formal accusation or factual finding that Plaintiff had diverted the medication. Instead, Clement's notes regarding the incident were brought to the attention of Oakes, who conferred with Dr. Canfield and decided to discontinue Plaintiff's Neurontin medication. Plaintiff did not receive Neurontin until March 19, 2014, when Dr. Canfield agreed to reinstate Plaintiff's prescription at a substantially lower dose of 100 milligrams three times per day.

It is also important to keep in mind that whether or not Plaintiff actually took his medication on August 21, 2012 is somewhat of a red herring. The question at hand is whether Defendants knew of and disregarded Plaintiff's serious medical needs. *Farmer*, 511 U.S. at 837. Thus, the fact that Oakes and Dr. Canfield may have acted "based on their belief that Plaintiff diverted the Neurontin medication on August 21, 2012," ECF No. 39-1, at 11, is inapposite. Rather, the focus must be on whether Defendants knew that Plaintiff needed Neurontin to deal with persisting nerve pain and whether they disregarded that need by discontinuing his prescription.

Prior to August 21, 2012, there was no disagreement about whether Plaintiff needed Neurontin to cope with his nerve pain. Dr. Canfield met with Plaintiff when he arrived at Southport and prescribed him 600 milligrams of Neurontin three times per day. Yet after there was a dispute about whether Plaintiff took his medication on one single occasion, Oakes and Dr. Canfield immediately discontinued the Neurontin prescription. In his declaration, Dr. Canfield states that "[I]t was my belief that since Plaintiff was not taking the prescribed Neurontin and instead diverting it, Plaintiff no longer needed the medication." ECF No. 39-9, Ex. G, at ¶ 15. The exact same sentence appears in Oakes' declaration. ECF No. 39-5, Ex. C, at ¶ 14. However, a reasonable jury could easily conclude that the decision to discontinue Plaintiff's

Neurontin prescription was based solely on the August 21, 2012 incident itself rather than any medical conclusion about the proper way to alleviate Plaintiff's nerve pain.

Similarly, the fact that Plaintiff received other medication in addition to Neurontin does not somehow transform this case into a "mere disagreement over the proper treatment" for Plaintiff's nerve pain. *Chance*, 143 F.3d at 703. Prior to the incident on August 21, 2012, Plaintiff was receiving both Neurontin for his nerve pain and Voltaren for the injury to his rotary cuff. On February 14, 2014, Dr. Canfield switched Plaintiff from Voltaren to Indocin. Plaintiff says he "persistently asked for his medication 'Neurontin' as that's the only medication that effectively combats the everyday intense pain that he suffers." ECF No. 49, at 17. Defendants cite *Ifill v. Goord*, 2007 WL 2874413 (W.D.N.Y. Sept. 27, 2007), *vacated in part on other grounds by* 326 F. App'x. 625 (2d Cir. 2009) and *Guarneri v. Wood*, 2011 WL 4592209 (N.D.N.Y Sept. 2, 2011), *report and recommendation adopted by* 2011 WL 4594149 (N.D.N.Y. Sept. 30, 2011), arguing that disputes about the type of medication needed to alleviate an inmate's pain do not rise to the level of an Eighth Amendment violation. ECF No. 39-1, at 11-12. But in both *Ifill* and *Guarneri*, there was no dispute about the fact that prison doctors had actually *made a medical decision* about the proper course of treatment. *Ifill*, 2007 WL 2874413 at *4-5; *Guarneri*, 2011 WL 4592209 at *13. As the Second Circuit made clear in *Chance*, "[w]hether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Chance*, 143 F.3d at 703. Here, although Defendants now argue that Voltaren and Indocin were sufficient to treat Plaintiff's nerve pain, a reasonable jury could easily conclude that this argument is simply a *post hoc* rationalization and that the decision to take away Plaintiff's nerve pain medication was an act of retribution rather than a medical judgment. Therefore, a genuine issue of material fact does exist as to whether Defendants acted with deliberate indifference.

Because genuine issues of material fact exist as to both the objective and subjective prongs of the Eighth Amendment analysis, Defendants' Motion for Summary Judgment is denied as to Plaintiff's claim regarding the discontinuance of his Neurontin medication.

## IV.   Dr. Canfield's Failure to Obtain a Metal Leg Brace

In addition to the discontinuance of Neurontin, Plaintiff claims Dr. Canfield was deliberately indifferent in "refus[ing] to order Plaintiff a leg brace which helps him walk without pain." ECF No. 1, at 5. Dr. Canfield argues that summary judgment should be granted as to this claim because Plaintiff has failed to establish that Dr. Canfield acted with a sufficiently culpable state of mind. ECF No. 39-1, at 13. Because no reasonable jury could find that Dr. Canfield acted with deliberate indifference when he ordered a leg brace for Plaintiff, summary judgment must be granted as to this claim.

As explained above, inadequate medical care by a prison official only rises to the level of a constitutional violation when the official is deliberately indifferent to the inmate's serious medical needs. *Farmer*, 511 U.S. at 828. The subjective prong is satisfied when the prison official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. Mere negligence, without more, is insufficient to engender a constitutional claim. *Chance*, 143 F.3d at 703.

Here, Dr. Canfield met with Plaintiff on July 10, 2012 to address issues with his right foot. Dr. Canfield measured Plaintiff's leg and sent a request for an orthotic leg brace to be fashioned, which would allow Plaintiff to ambulate with decreased pain and increased stability. However, this request was denied by security personnel. Security was concerned that the metal components of the leg brace posed a security risk because they could be used to make a weapon or block a door. Dr. Canfield's actions suggest that he tried to attend to Plaintiff's medical needs by ordering the leg brace that Plaintiff wanted, not that he was deliberately indifferent.

Plaintiff alleges Dr. Canfield has ordered many leg braces for inmates in the past, and therefore was "in full knowledge that the facility security provisions will not allow the inmate to have the leg brace." ECF No. 49, at 19. In light of this security policy, Plaintiff alleges that simply ordering a leg brace "effectively denies the inmate medical attention." *Id.* But Plaintiff does not provide any evidence from which a reasonable jury could conclude that Dr. Canfield knew the request would be denied. More importantly, even if Dr. Canfield knew or should have known that the request for a leg brace would be denied, it is undisputed that the decision to deny Plaintiff the leg brace was outside of Dr. Canfield's control.

Summary judgment is therefore granted as to Plaintiff's claim regarding Dr. Canfield's failure to obtain a metal leg brace.

## V.    Personal Involvement

Both Griffin and Clement argue that they may not be held liable under § 1983 because they were not personally involved in any constitutional violation.

In a § 1983 claim, supervisor defendants may not be held vicariously liable for a subordinate's constitutional violation via the theory of *respondeat superior*. *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 691 (1978). In other words, a supervisor may only be liable for "his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). In *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), the Second Circuit set forth five ways in which a supervisor defendant's personal involvement in a constitutional violation may subject him or her to liability: (1) direct participation in the alleged constitutional violation; (2) failure to remedy the wrong after being informed of the violation through a report or appeal; (3) creation or continuance of a policy or custom under which the unconstitutional practices occurred; (4) gross negligence in supervising the subordinates who committed the wrongful acts; or (5) deliberate

16

indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Id.* at 872.

### A. Griffin

During the time he was not receiving Neurontin, Plaintiff wrote to Superintendent Thomas Griffin ("Griffin") "a number of times[,] making him aware that defendant Clement falsely accused him of not taking his medication, and ultimately caused defendants Oakes and Canfield to deny plaintiff his medication." ECF No. 49, at 21. In addition, Plaintiff once stopped Griffin as he was making rounds and said, "Excuse me, superintendent. They not giving me my medication. They saying they discontinued my medication because they saying I cuffed it, I hold it. Where is the misbehavior report? You can't just take me off of your medication like that." ECF No. 39-3, Ex. A, at 25:9-13.

These facts are indistinguishable from *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 650 (W.D.N.Y. 2010), in which the plaintiff inmate alleged that he wrote to Superintendent Kirkpatrick of Wende Correctional Facility on several occasions, and that Kirkpatrick either did not respond at all or simply forwarded the letters to subordinates. *Id.* In addition, the plaintiff alleged "that on August 9, 2006, he spoke directly to Kirkpatrick about the alleged harassment that he was receiving from certain officers, and that Kirkpatrick took no action in response." *Id.* The Court in *Rosales*, deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, held that the plaintiff had failed to sufficiently allege personal involvement on the part of Superintendent Kirkpatrick. *Id.* Here, where the issue at hand is whether Plaintiff has established a genuine issue of material fact for trial, Plaintiff has similarly failed to establish that Superintendent Griffin was personally involved in the discontinuance of Plaintiff's Neurontin medication. *Id.*; *see also Jones v. Tompkins*, No. 12-CV-57, 2014 WL 860334, at *5 (W.D.N.Y.

Mar. 5, 2014); *McFadden v. Friedman*, No. 9:12-CV-0685 GTS/CFH, 2015 WL 5603433, at *19 (N.D.N.Y. Sept. 23, 2015).

### B. Clement

Clement argues that he was not personally involved in any constitutional violation because he simply "wrote down his observation of Plaintiff diverting the Neurontin medication in Plaintiff's medical record and then gave it to P.A. Oakes," and that "[i]t was the doctor that discontinued the medication, not the nurse." ECF No. 39-1, at 17-18.  But again, because Plaintiff is the non-moving party, the Court must assume for the purposes of this summary judgment motion that Plaintiff did in fact take his medication. *See, e.g., Adickes,* 398 U.S. at 158-59.  That means that Clement both falsely accused Plaintiff of diverting his medication and gave this accusation to Oakes, who discontinued Plaintiff's Neurontin prescription purely based on Clement's accusation.  Clement was therefore directly and personally involved.

## VI.   Qualified Immunity

Defendants' sixth argument in support of summary judgment is that Defendants are entitled to qualified immunity.  However, Defendants' entire argument consists of a two-sentence boilerplate recitation of the legal standard and a follow-up sentence that reads: "Accordingly, the Defendants are entitled to qualified immunity." ECF No. 39-1, at 18.  The Court deems this argument waived. *See Lyn v. Inc. Vill. of Hempstead*, No. 03 Civ. 5041, 2007 WL 1876502, at *16 n.13 (E.D.N.Y. June 28, 2007), *aff'd*, 308 F. App'x 461 (2009) (summary order) ("Issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citations and internal quotations omitted).

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 39) is GRANTED IN PART and DENIED IN PART.  The Motion is granted with respect to

Plaintiff's official capacity claims, Plaintiff's claim against Superintendent Griffin, and Plaintiff's deliberate indifference claim against Dr. Canfield regarding the leg brace. Superintendent Griffin is hereby dismissed from this action. The Motion is denied with respect to Plaintiff's deliberate indifference claim against Clement, Oakes, and Dr. Canfield regarding the discontinuance of Plaintiff's Neurontin medication.

      IT IS SO ORDERED.

Dated: February 29, 2016
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court